[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case has been tried to the court. After considering the evidence, the court concludes that the plaintiff has not proven its case and that judgment must enter for the defendant.
This case involves a large area of land in downtown Naugatuck that was once the site of the Uniroyal Manufacturing Company. In 1984, Uniroyal had long gone out of business, and its deteriorating, vacant plant was an eyesore to the community. In addition, the community needed jobs, and none were being provided by the dormant plant. The property, which had been owned by a series of developers who had done nothing with it, was then owned by Naugatuck Renewal Associates I and Naugatuck Renewal Associates II.
In September 1984, the State Department of Economic Development, the Borough of Naugatuck and General Data Comm Industries entered into a Project Plan (Ex. J.) for a mini-industrial park on the site in question, pursuant to Conn. Gen. Stat. 8-186, et seq. The gist of this agreement was that General Data Comm would acquire the property from its then owners and that the State and a local development agency would finance the project by grants in the total amount of $3.1 million. General Data Comm would then at its own expense renovate and improve the site to operate its business there.
On April 1, 1985, the Borough, the State, and General Data Comm entered into an agreement (Ex. L) that is the subject of this action. Since certain hoped for means of financing had not worked out, it was now agreed that the original plan would be altered to some extent. The property was divided into three parcels, known as Tracts A, B, and C. GDC Naugatuck, Inc. was to purchase Tracts A and B for a combined price of $550,000. It was additionally CT Page 28 given a five-year option to purchase Tract C for an additional $500,000. In consideration for this option, GDC agreed to demolish, at its own expense, all of Tract C with the exception of one small historic building.
The day after the agreement was signed, GDC went to work. It demolished Tract C (with the exception of the historic building), demolished all of Tract B, and renovated a large warehouse on Tract A. This was a huge task, involving the expenditure of millions of dollars. Today, General Date Comm operates a thriving operation employing about 700 people on Tract A. This has been an award winning development, and the plaintiff offers no criticism of the extent to which General Data Comm has developed the site.
This case arises from a dispute over Tract C. On July 23, 1987, GDC notified the Borough in writing that it was exercising its option. (Ex. 6.) The Borough commenced this action the very next day. (The complaint is dated July 24 and was served on July 27.) In its Amended Complaint, the Borough prays "[t]hat the court order, adjudge and decree the said option to be void and of no affect [sic]." Although the documentary evidence is thick and millions of dollars are at stake, the case boils down to a relatively straightforward question of whether GDC violated the 1985 agreement by its method of financing a portion of the development.
The 1985 agreement contains one sentence at issue here: "GDC represents and agrees that GDC's purchase of Tracts A and B and/or C (if acquired) and its other undertakings pursuant to this Agreement, are and will be, for the purpose of development of the Development Project and not for speculation in land holdings." (Ex. L, p. 9, par. (n).) The Borough alleges that this promise was violated by GDC in the spring of 1987.
GDC needed millions of dollars to finance the development of the project. It ultimately came up with the money through the means of a sale and leaseback of Tracts A and B. On March 2, 1987, GDC sold Tracts A and B to a consortium of banks named General-Lord Realty Corporation, for $21.9 million. (Ex. F, G, H and P.) In return, GDC leased back the premises for seven years with an option to repurchase at the end of the seven-year period. The repurchase option, however, had to be exercised by March 2, 1992, and was not exercised by that time. Whether a new lease period or a purchase will eventually he negotiated is unknown, but as of the date of the hearing in this matter, November 12, 1992, CT Page 29 General Data Comm was continuing to operate on the site with no plans to leave. All or almost all of the $21.9 million proceeds from the 1987 sale were invested in the site and General Data Comm's operations on that site.
The Borough stipulates that GDC "develop[ed]" the site in question. It asserts, however, that GDC also "speculat[ed] in land holdings" in violation of paragraph (n) of the 1985 agreement. (Ex. L.) The parties, with skillful attorneys as their champions, have waged a battle over the meaning of these four words that rivals the battle of the Greek and Trojan armies over the body of Patroclus. Assuming, for purposes of argument, that compliance with paragraph (n) of Ex. L is a condition precedent to GDC's exercise of its option to purchase Tract C and further assuming, again for the purposes of argument, that the Borough need not offer to restore GDC to its former position as a condition precedent to recission, the court finds that no violation of paragraph (n) has been established here.
The 1985 agreement is a carefully drafted document negotiated by business and governmental parties represented by attorneys. It does not prohibit GDC from selling any of the tracts in question. Law and public policy "favor the alienability of real property, its unrestricted use by its owner and certainty in the rights of the parties with interests therein." McArthur v. East Tennessee Natural Gas Co., 813 S.W.2d 417, 419 (Tenn. 1991). As American Jurisprudence explains,
 It is a well-established rule that restraints on alienation are not favored and it must appear from a construction of the instrument involved that a restraint was intended if it is to be treated as such in any case. Conditions against alienation are strictly construed, and even if they would otherwise be valid, are ineffectual unless certainly and clearly expressed. Any ambiguity rendering a deed subject to alternative constructions will be resolved against the grantor in order to avoid a construction that the deed contains a restraint upon alienation.
61 Am.Jur.2d Perpetuities 103 (1981). CT Page 30
Paragraph (n) prohibits not alienation but "speculation in land holdings." The basic concept of speculation has been recognized for hundreds of years. It is "dealing with a view to making a profit from conjectural fluctuations in the price rather than from earnings of the ordinary profit of trade." Webster's Third New International Dictionary, 2189 (1963). See United States v. Katzenbach, 208 F. 209, 213 (9th Cir. 1913). Adam Smith viewed it as an effort to make a "sudden fortune," as distinct from earnings "in consequence of a long life of industry, frugality, and attention." Adam Smith, The Wealth of Nations 102 (Everyman's Library ed. 1910). "Both high gains and a relatively short holding period are essential [components of] speculation." Andrews v. Lathrop, 315 A.2d 860, 863 (Vt. 1974). Congress has indirectly defined speculation in the capital gains context as involving the sale of assets held for less than one year.26 U.S.C. § 1222(1). See Peter Miller, The "Capital Asset" Concept: A Critique of Capital Gains Taxation: 1, 59 Yale L.J. 837, 838-39 (1950). Famous examples of speculation include the South Sea Bubble that ruined thousands in England in 1720 and the Tulipomania in Holland in 1636 when fortunes were made and lost on single tulip bulbs. See generally Charles Mackay, Memoirs of Extraordinary Popular Delusions and the Madness of Crowds (2d ed. 1852) (a book which is to this day required reading for stockbrokers-in-training). All speculations have in common the search for easy money without labor or enhancement of the quality of the commodity sought to be traded. They are, by nature, enterprises in which "[e]very fool aspire[s] to be a knave." Id. at 52.
In this case, it is manifest from the text of paragraph (n) of Ex. L that "speculation in land holdings" was sought to be contrasted with "development of the Development Project." GDC promised that it would develop the land in question and not let it sit undeveloped until it could be sold at an advantageous price. (Although the text is unambiguous on this point, credible testimony submitted to the court establishes that this was exactly what the parties intended to express.)
It is stipulated that GDC "developed" the project. It did so at the expense of years of labor and millions of dollars. It remains on the land to this day employing hundreds of people. This is not speculation in any dictionary, historical, or contractual sense of the word.
Judgment shall enter for the defendant. CT Page 31
Dated at Waterbury, this 5th day of January, 1993.
JON C. BLUE J. Judge of the Superior Court